UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIM. NO. 04-30033-MAP |
| | ) | |
| vs. | ) | |
| | ) | |
| RAYMOND ASSELIN, SR., et al. | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S MOTION IN LIMINE TO ADMIT CERTAIN EVIDENCE**

The United States of America, by and through Michael J. Sullivan, United States Attorney for the District of Massachusetts, and William M. Welch II and Steven H. Breslow, Assistant United States Attorneys, hereby files the instant Motion in Limine to Admit Certain Evidence.

The government respectfully submits that the Court admit the following evidence at trial: (1) pursuant to Fed. R. Evid. 404(b), evidence that in or about 1990, the defendant Peter Davis participated in a kickback conspiracy with Raymond Asselin, Sr. and Joseph Asselin; (2) evidence of overt acts and racketeering acts in furtherance of the charged offenses that were not specified in the Superseding Indictment; (3) evidence that in or about 2004, the defendant participated with Asselin, Sr. in a separate conspiracy to obstruct the government's investigation and prosecution of the charged offense; and (4) pursuant to Fed. R. Evid. 1006, charts summarizing various voluminous records.

I.    Statement Of Facts

    1.    The Charged Offenses

The above-captioned Superseding Indictment charges the defendant Peter Davis with racketeering, in violation of Title 18, United States Code, Section 1962(c) (Count 1); racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d) (Count 2); conspiracy to commit bribery, in violation of Title 18, United States Code, Sections 371 and 201 (Count 3); and obstruction of justice, in violation of Title 18, United States Code, Section 1503 (Count 107).

From approximately 1986 through the late 1990s, the defendant owned and operated a contracting business called P.J. Richfield, Inc. ("P.J."), which from 1990 through 1998 received approximately $3.1 million in direct payments from the Springfield Housing Authority (the "SHA"). Superseding Indictment, ¶ 10. During this period, the SHA was run by Raymond Asselin, Sr. ("Asselin, Sr.") and Arthur Sotirion ("Sotirion"), who served, respectively, as the Executive Director and Assistant Executive Director. ¶¶ 6-7.

Asselin, Sr., Sotirion and others operated the SHA as a racketeering enterprise with the aim of enriching themselves and their families by, *inter alia*, steering contracts and sub-contracts to certain contractors like the defendant, who paid kickbacks in return for the contracts and other preferential treatment. ¶¶ 21-35. The defendants also sought to conceal the activities of the

racketeering enterprise by, *inter alia*, destroying evidence, secreting evidence, and advising potential witnesses not to tell the truth. ¶ 26. This pattern of racketeering activity spanned from 1988 through April 2003, ¶ 36, during which the defendant committed numerous racketeering acts, many of which are specified in the Superseding Indictment. ¶¶ 40(3)-40(4), 54.[1]

2. The Defendant's Specified Offense Conduct

The Indictment specifies that, in 1996 and 1997, the defendant wrote thirteen separate checks, totaling approximately $65,000, to pay other contractors to construct or renovate the homes of Joseph Asselin and Christopher Asselin, two sons of Asselin, Sr. ¶¶ 40(3)-(4). Moreover, in an effort to obstruct justice and conceal this racketeering activity, on April 10, 2003, the defendant lied to investigating agents of the Federal Bureau of Investigation by telling them that he had not paid for any home improvements for any Asselin family members.[2]

3. The Defendant's Unspecified Offense Conduct

In addition to the acts specified in the Superseding Indictment, the government intends to introduce in its

---

[1] The Superseding Indictment also charges the defendant's racketeering acts as overt acts in furtherance of a parallel bribery conspiracy spanning from approximately 1993 to April 2003. ¶¶ 57-61.

[2] In addition to charging the false denial as a racketeering act, the Superseding Indictment also charges the defendant with obstructing a federal investigation through this statement. ¶ 134.

case-in-chief evidence that the defendant participated in a broad range of other conduct that furthered the charged racketeering and bribery conspiracies. For example, the government expects to prove that in 1993, Asselin, Sr. and Sotirion awarded the defendant a valuable SHA contract, permitted the defendant to pad that contract and extract profits by a variety of improper means, and gave him other preferential treatment, all in exchange for receiving as a kickback an equal share of profits from the defendant's contract.

In particular, in 1993, Asselin and Sotirion steered lucrative contracts to modernize SHA housing developments in compliance with the Americans with Disabilities Act (the "ADA/504 Contracts") to the defendant and another corrupt contractor, Gary Baribeau of G & R Associates ("Baribeau"). Sotirion directed Baribeau, who had won the principal, or general, contract, to use the defendant as his sub-contractor, and further ordered Baribeau to pad the defendant's sub-contract with a large fee for "supervision."[3] Together, the SHA awarded the defendant and Baribeau contracts worth approximately $1.2 million.

According to the project's architect, the project's general manager, other witnesses, and a variety of documents, the defendant's performance on the ADA/504 contract was poor, non-responsive, and incomplete, resulting in problems that require

---

[3]    It is the general contractor's responsibility to supervise the sub-contractor, not vice-versa.

remediation even to this day.  In addition, Asselin and Sotirion permitted the defendant to use SHA materials, equipment, and employees to perform certain aspects of the contract, even though the defendant never reimbursed SHA for these resources.  Further, the defendant paid workers in cash for less than the prevailing wage, and substituted inferior materials for specified materials. Both the architect and the general manager complained to Asselin, Sr. and Sotirion about various aspects of the defendant's performance, but the SHA directors took no corrective action.

To the contrary, on or before October 17, 1994, the defendant and Baribeau certified that they had completed all of the contracted work, and Asselin, Sr. and Sotirion authorized their complete payments.  On or about this time, the defendant wrote notes, later seized from Sotirion's office, in which the defendant calculated three equal shares of profits from both his contract and Baribeau's contract: 1/3 to be paid to the defendant, 1/3 to be paid to Asselin, Sr., and 1/3 to be paid to Sotirion.  As late as January 1995 – three months after Sotirion and Asselin authorized final payment on the defendant's purportedly completed work – SHA's project architect continued to complain about, and document, the extensive work remaining on the defendant's project.

4.  <u>The Expected Testimony of Joseph Asselin</u>

The government intends to call as a witness in its case-in-chief Joseph Asselin ("Asselin"), who is expected to

testify about: (I) the defendant's participation in the charged racketeering and bribery conspiracies; (ii) a prior kickback scheme involving the defendant, himself, and Asselin, Sr.; and (iii) a later scheme by the defendant and Asselin, Sr. to obstruct the government's investigation and prosecution of the defendant in the charged offenses.

    a.   <u>Background</u>

In the late 1980s, Asselin worked at Suffield Bank, working as a loan officer for construction lending. Asselin met the defendant through his father's "breakfast club," an informal Saturday morning gathering of friends who occasionally formed business ventures. In approximately 1986, Asselin, Sr. suggested that Asselin and the defendant invest in real estate together, and the pair subsequently formed a company: P.J. Richfield ("P.J."), signifying the partnership of "P." Davis and "J." Asselin. Asselin obtained his share of the financing (approximately $20,000) from his father.

Through P.J., Asselin and the defendant first purchased two lots in South Hadley, which they developed and sold at a profit. Asselin and the defendant rolled their profit into a second development in Granby, yielding more profit that subsequently they rolled into a much larger parcel in Wilbraham. However, in approximately 1989, the residential real estate market suffered a downturn, and the Bank of Boston ultimately foreclosed on the Wilbraham properties that they could not sell.

After the foreclosure sales, the defendant told Asselin that P.J. had essentially "broken even" and had lost all its remaining profits. Asselin thus assumed that his own involvement with P.J. was finished, and he returned his stock certificates to the defendant. However, Asselin also knew that the defendant continued to operate P.J., which in approximately 1990, began to obtain SHA work through his father.

> b.  The Prior Kickback Scheme

In approximately 1990, Asselin's job at Suffield Bank included developing properties that the bank had obtained through foreclosure, including a Northampton development called Indian Hills. One day, Asselin Sr. suggested to the defendant and Asselin that Asselin steer sub-contracts to the defendant in exchange for kickbacks or "commissions," and the pair agreed to the scheme.

Thereafter, Asselin regularly told the defendant the prices that he had to beat in order to obtain the Indian Hills contracts, and the defendant submitted barely lower bids. Asselin awarded approximately five such contracts to the defendant in this manner. In exchange, the defendant paid Asselin a percentage of the value of each contract, for a total of approximately $20,000 in cash. Asselin gave these kickbacks to his father, to repay his earlier loan to finance Asselin's share of P.J. The defendant, far from being a victim in this scheme, "loved" the arrangement, since it allowed him to win every contract he sought.

7

c.    The Charged Kickback Scheme

In approximately 1997, Asselin began to build a home in Amherst.  In the late summer, his father told Asselin that he wanted to give Asselin a gift.  Asselin, Sr. explained that the defendant owed him money and wanted to repay the debt by covering some of Asselin's home construction costs.  According to Asselin, Sr., the defendant wanted to repay him through construction costs rather than in cash so that the defendant could deduct the payments as business expenses; this way, the defendant could repay Asselin, Sr. "dollar for dollar."  Asselin, Sr. added that the defendant wanted to make all of the payments in 1997 because the defendant intended to close out a current SHA project by the end of 1997. Asselin, Sr. asked Asselin for a list of the contractors and vendors working on his house, and Asselin answered that the vendors included Springfield Lumber and Jack Mateuse of JAN Masonry; his father replied, "Good, Peter has used those guys, too."

During construction, Asselin, Sr. would ask Asselin for his bills, explaining that the defendant was anxious to pay them quickly.  In fact, the defendant was so eager to pay the bills that he paid Mateuse even before Mateuse finished the masonry work on Asselin's home.

Like the defendant, other SHA contractors also paid for various construction expenses on Asselin's home.  Asselin knew that all of these contractors owed his father money for "fees" or

8

"commissions" that his father earned by generating work for the contractors, either at the SHA or at other housing authorities. Asselin recognized that, as the SHA director, his father had leverage over all of these vendors.

After the construction was complete, in approximately 2001, Asselin met the defendant, who was in town for a wedding. The defendant complimented Asselin on his new home, and Asselin thanked the defendant. The defendant then replied, "It worked out for both of us," which Asselin understood to mean that the scheme benefitted them all: Asselin received a new home, his father was repaid, and the defendant was able to deduct the "commissions" that he owed as business expenses.

After the wedding (which took place during a time when other members of the Asselin family were being investigated by the federal government), Asselin asked his father if the defendant was worried about being investigated. Asselin, Sr. replied that the defendant was "sitting okay" because the period for auditing his 1997 income tax return had passed.

d.  The Scheme To Obstruct The Prosecution Of The Charged Kickback Scheme

A few months after the initial indictment of the instant case in July, 2004, Asselin discussed the case with his father. Asselin, Sr. told him that the defendant had planned to say that the home construction payments were a return of P.J.'s profits from

their earlier real estate dealings.  Asselin replied that he believed that there were no profits, since he recalled that the Wilbraham deal had resulted in foreclosures.[4]  Asselin, Sr. responded that the defendant would think of some other explanation, and Asselin replied, "Whatever it takes to get us off."  Asselin believed that in this conversation, his father was inquiring whether he would join the defendant's efforts to develop a cover story for the illicit payments.

II.  The Court Should Admit Evidence Of Overt Acts And Racketeering
     Acts Not Specified In The Indictment

It is well-settled that the government is entitled to offer evidence of uncharged overt acts to establish a charged conspiracy, since those acts are part of the charged conspiracy itself.  See, e.g., United States v. Napolitano, 340 F.2d 313, 314 (1st Cir. 1965) (stating in a conspiracy case, "the failure to specify any particular piece of conduct as an overt act does not prevent proof thereof"); United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994) (stating that when the indictment contains a conspiracy charge, "uncharged acts may be admissible as direct evidence of the conspiracy itself"); United States v. Jackson, 845 F.2d 1262, 1265

---

[4]    In fact, the Bank of Boston's foreclosure sales did not yield enough cash to settle the remaining debt owed by P.J. to the bank.  Consequently, in January 1992, the Bank of Boston commenced suit against both the defendant and Asselin to recover the deficiency, and by November 2002, the bank had obtained a default judgment against them for $77,946.

(5th Cir. 1988) (stating the government "may prove additional overt acts not listed in the indictment").  The First Circuit has held that the commission of overt acts is not required for a RICO conspiracy conviction, United States v. Anguilo, 847 F.2d 956, 964 (1st Cir. 1988), and the Second Circuit has held that "a conspiracy conviction may rest on an overt act not charged in the indictment." United States v. Bryan, 122 F.3d 90, 93 (2d Cir. 1997) (quoting United States v. Armone, 363 F.2d 385, 400 (2d Cir. 1966)). Indeed, the First Circuit itself has relied upon unspecified racketeering acts to hold that sufficient evidence existed for the Government to prove the essential elements of a RICO charge. United States v. Connolly, 341 F.3d 16, 26-27 (1st Cir. 2003).

Here, the Superseding Indictment alleges that the defendant participated in a racketeering conspiracy from approximately 1988 through April 2003 and a parallel bribery conspiracy from approximately 1993 through at least April 2003.  ¶¶ 55-61. Although the Superseding Indictment specifies the thirteen checks written by the defendant to pay for Asselin's home construction as racketeering acts and overt acts, the government can offer evidence about other alleged uncharged acts central to these conspiracies, such as the preferential treatment and profit sharing related to the ADA/504 Contracts. See Connolly, 341 F.3d at 26-27.

III. The Court Should Admit Evidence Of The Defendant's Prior
Kickback Conspiracy With Asselin, Sr. And Joseph Asselin

Fed. R. Evid. 404(b) provides:

> Evidence of other crimes, wrongs, or acts is
> not admissible to prove the character of a
> person in order to show action in conformity
> therewith. It may, however, be admissible for
> other purposes, such as proof of motive,
> opportunity, intent, preparation, plan,
> knowledge, identity, or absence of mistake or
> accident."

Rule 404(b) is a rule of "'inclusion which allows the introduction
of evidence of other crimes, wrongs, or acts unless the evidence
tends to only prove criminal disposition.'" United States v.
Cassiere, 4 F.3d 1006, 1021 (1st Cir. 1993)(quoting United States
v. Fields, 871 F.2d 188, 196 (1st Cir. 1989)). See also Huddleston
v. United States, 485 U.S. 681, 688-89 (1988) (stating "Congress
was not nearly so concerned with the potential prejudicial effect
of Rule 404(b) evidence as it was with ensuring that restrictions
would not be placed on the admission of such evidence."). As the
First Circuit has noted, "The most striking aspect of the rule is
its inclusive rather than exclusionary nature: should the evidence
prove relevant in any other way it is admissible, subject only to
the rarely invoked limitations of Rule 403." United States v.
Zeuli, 725 F.2d 813, 816 (1st Cir. 1984).

Accordingly, the First Circuit reviews the "admissibility of
[Rule 404(b)] evidence under a two-pronged test: first, a court
must determine whether the evidence in question has any special

relevance exclusive of defendant's character or propensity; and second, notwithstanding its special relevance, whether the evidence meets the standard set forth in Fed. R. Evid. 403." United States v. DeCiccio, 370 F.3d 206, 211 (1st Cir. 2004).  Even if evidence may be construed as propensity evidence, this evidence is still admissible "if it is used to show any of the other elements set out in Rule 404(b)." Id. at 210-11.

"Under Huddleston v. United States, 485 U.S. 681, 689 (1988), `similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor.'" DeCiccio, 370 F.3d at 211.  In making such a determination,

> the trial court neither weighs credibility nor makes a finding that the Government has proved the conditional fact by a preponderance of the evidence.  The court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact – here, that the televisions were stolen – by a preponderance of the evidence.

Huddleston, 485 U.S. at 690.  Upon making such a determination, a trial court then must focus "on two factors to determine the probative value of prior bad act evidence: `the remoteness in time of the other act and the degree of resemblance to the crime charged.'" DeCiccio, 370 F.3d at 213 (citation omitted)..

1. The Evidence of the Prior Kickback Conspiracy Is Admissible To Prove The Defendant's Intent, Knowledge, Or Absence Of Mistake

Rule 404(b) expressly permits the introduction of evidence to prove intent, knowledge, or absence of mistake.  Fed. R. Evid. 404(b).  As the First Circuit has recognized:

> In a conspiracy case, each party's intent to conspire must be proven beyond a reasonable doubt. . . .  In every conspiracy case, therefore, a not guilty plea renders the defendant's intent a material issue and imposes a difficult burden on the government.  Evidence of such extrinsic offenses as may be probative of a defendant's state of mind is admissible unless he "affirmatively take[s] the issue of intent out of the case."

United States v. Zeuli, 725 F.2d at 816 (citations omitted).  See also United States v. Scelzo, 810 F.2d 2, 4 (1st Cir. 1987) (noting that "[w]e have thus held that evidence of similar past crimes or wrongful acts may be especially appropriate in conspiracy prosecutions").

Here, the defendant's intent will almost certainly be a primary issue at trial, particularly where the government expects to offer undisputed proof that in 1997 the defendant wrote thirteen checks totaling $65,000 to help construct Asselin's house.  As set forth above, the government expects that Asselin will testify that the defendant made these payments with the intent to eradicate a debt owed to his father, the SHA director, for commissions or fees that Asselin, Sr. earned by generating work for the defendant.

14

In this context, Asselin's testimony about the prior kickback scheme is highly probative of the defendant's intent, knowledge, absence of mistake. The testimony outlines the defendant's willing involvement in a remarkably similar kickback scheme, where at the suggestion of his father, Asselin steered contracts to the defendant, who gladly paid him "commissions" in return.

Courts have routinely admitted such evidence to prove intent, knowledge, or absence of mistake. See United States v. Zeuli, 725 F.2d at 816 (approving evidence of prior extortion demands to prove intent in a conspiracy to extort); United States v. Crocker, 788 F.2d 802, 804 (1st Cir. 1986) (approving evidence of prior arrest for uttering counterfeit checks to show intent in subsequent conspiracy to cash counterfeit checks); United States v. Orlando-Figueroa, 229 F.3d 33, 45 (1st Cir. 2000) (affirming introduction of evidence in a bribery trial that one defendant had previously demanded a sum of money and a per-tire royalty in exchange for awarding a municipal tire removal contract, to prove defendant's intent and lack of mistake after he testified that the transaction was innocent); United States v. Bruno, 809 F.2d 1097, 1106 (5th Cir. 1987) (approving evidence of defendant's prior bribery involvement to establish intent elements of conspiracy to commit fraud and bribery and wire fraud); and United States v. Shields, 999 F.2d 1090, 1099 (7th Cir. 1993) (approving evidence of co-defendant attorney's past bribery of another state court judge

in prosecution of co-defendant and defendant state judge arising
from co-defendant's bribery of defendant).

> 2. The Prior Kickback Scheme Explains the Background to the
>    Charged Conspiracy and Illuminates the Relationship
>    Shared by the Defendant, Asselin, and Asselin, Sr.

Prior act evidence may be admitted to inform the jury of the
background, formation, and development of the illegal relationships
among the co-conspirators and, in particular, to help the jury
understand the basis of the mutual trust shared by the
co-conspirators. United States v. Escobar-DeJesus, 187 F.3d 148,
169 (1st Cir. 1999); see also United States v. Devin, 918 F.2d 280,
287 (1st Cir. 1990) (stating that defendant's uncharged acts were
relevant to "depict the setting in which the charged racketeering
and extortion took place" and that "evidence of uncharged conduct
may reasonably be needed to relate the complete story of the
charged crimes"); United States v. Brennan, 798 F.2d 581, 589-90
(2d Cir. 1986) (approving admission in bribery case of prior bribes
to explain how the illegal relationship between judge and bribe
payor developed, to show the basis of trust between judge and bribe
payor, and to complete the story of the crimes charged).

As with the prior bribes in Brennan, evidence of the
defendant's prior kickback scheme serves several proper purposes
under Rule 404(b). First, the evidence "help[s] explain to the
jury how the illegal relationship between [Asselin and the

defendant] developed." <u>Id.</u> at 590. Indeed, the evidence establishes a prior kickback scheme that, just like the charged conspiracy, was brokered by Asselin, Sr. for the benefit of his son. Further, the evidence establishes "the basis for the trust" among the defendant, Asselin, and Asselin, Sr. <u>Id.</u> Specifically, the prior kickback scheme enables the jury to understand why the defendant trusted that he could rely on Asselin and his father to remain quiet about the home construction payments.

Finally, "[w]ithout this evidence, the jury would have [] a truncated and possibly confusing view of the respective roles played by" Asselin, his father, and the defendant. <u>Id.</u> <u>See also</u> <u>United States v. Araujo</u>, 79 F.3d 7, 8 (2d Cir. 1996) (approving 404(b) evidence that tended to prove the nature of the relationship between defendant and the other conspirators, to explain why cooperating witness asked defendant to participate in crime, and to explain why cooperating witness trusted the defendant as a co-conspirator).

IV. Admission Of The Prior Kickback Scheme Would Not Unfairly
    <u>Prejudice The Defendant</u>

As the First Circuit has noted, there is "widespread" authority for the sparing application of Rule 403 to exclude relevant 404(b) evidence. <u>United States v. Zeuli</u>, 725 F.2d at 817. "'Undue prejudice would seem to require exclusion only in those instances where the trial judge believes that there is a genuine

risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the proffered evidence.'" Id. (quoting United States v. Masters, 622 F.2d 83, 87 (4th Cir. 1980)). See also United States v. Scelzo, 810 F.2d 2, 5 (1st Cir. 1987) (noting that the proffered 404(b) evidence, while potentially prejudicial, "was not, however, shocking or heinous and so was not likely to inflame the jury.")

Here, the highly probative value of the defendant's prior kickback scheme is not substantially outweighed by the danger of unfair prejudice, since that scheme "did not involve conduct more serious than the charged crime[s] and the district court [can give] a proper limiting instruction." United States v. Williams, 205 F.3d 23, 34 (2d Cir. 2000).

The prior kickback scheme involved approximately five payments totaling at most $20,000, compared to the thirteen checks totaling approximately $65,000 specified in the indictment. Thus, the charged offense involved at least three times as many payments and approximately three times the value of money. Since the prior kickback scheme was comparably less serious and extensive, it is not likely to excite the jury to "irrational behavior," United States v. Zeuli, 725 F.2d at 817, nor is it by any means "shocking or heinous." United States v. Scelzo, 810 F.2d at 5.

"By design, all evidence is meant to be prejudicial; it is only unfair prejudice which must be avoided." United States v.

Rodriguez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989).  Further, a limiting instruction can prevent any improper use of the evidence by the jury, and thus insulate against the risk of any unfair prejudice.  See United States v. Powell, 50 F.3d 94, 101 (1st Cir. 1995).

Because the probative value of the proffered evidence is not substantially outweighed by the danger of unfair prejudice, it should be admitted.  United States v. Guyon, 27 F.3d 723, 729 (1st Cir. 1994).

V.    The Court Should Admit Evidence of the Subsequent Conspiracy
      to Obstruct the Investigation and Prosecution of the Charged
      Offense Conduct

Asselin's testimony concerning the defendant's post-indictment scheme to concoct a cover story about his payments for Asselin's home should be admitted pursuant to Fed. R. Evid. 801(d)(2)(E).

Rule 801(d)(2)(E) provides in pertinent part:

Statements which are not hearsay.  A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

In United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977), the First Circuit stated that "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made . . . the statement was in furtherance of the conspiracy."  In determining whether the

Government has met the prerequisites of the Rule, "the trial court is not required to decide the Petrozziello question prior to admitting hearsay statements under Rule 801(d)(2)(E), but may 'admit the statements provisionally, subject to its final Petrozziello determination at the close of all the evidence.'" United States v. Capelton, 350 F.3d 231, 241 (1st Cir. 2003) (citations omitted).

1.    The Defendant and Asselin, Sr. Were Conspiring To
      Obstruct The Investigation Into The Charged Offenses

To meet the preponderance standard of Rule 801(d)(2)(E), the government must provide some extrinsic proof of the declarant's involvement in the subject conspiracy. United States v. Sepulveda, 15 F.3d 1161, 1182 (1st Cir. 1993). The threshold evidence offered by the government need not be overwhelming. United States v. Ammar, 714 F.2d 238, 250 (3d Cir. 1983).

Here, by the time of the conversation in 2004, both Asselin, Sr. and the defendant had been indicted for their efforts to obstruct the investigation of the racketeering and bribery conspiracy. For example, during the summer of 2002, Asselin, Sr. counseled a witness to provide false testimony to the grand jury. Superseding Indictment, ¶ 247; see also ¶¶ 243-46 (charging similar obstruction). Similarly, on April 10, 2003, the defendant falsely told special agents of the Federal Bureau of Investigation that he had not paid for any home improvements for any members of the

20

Asselin family.  ¶ 248.

In this context, the 2004 conversation in which Asselin, Sr. conveyed to his son the defendant's proposed cover-up story about the house payments clearly evinces a distinct conspiracy to obstruct the ongoing criminal investigation and prosecution.

2.    The Conversation Is In Furtherance of the Conspiracy

Generally, a co-conspirator's statement is considered to be "in furtherance of the conspiracy" as long as it tends to promote one or more of the objects of the conspiracy.  United States v. Fahey, 769 F.2d 829, 839 (1st Cir. 1985).  A statement need not be necessary or even important to the conspiracy, or even made to a co-conspirator, as long as it can be said to advance the goals of the conspiracy in some way.  United States v. Martinez-Medina, 279 F.3d 105, 117 (1st Cir. 2002).  Moreover, "in furtherance" does not require actual advancement or achievement of the conspiracy's goals.  United States v. Guerro, 693 F.2d 10, 13 (1st Cir. 1982) (co-conspirator statements regarding willingness to sell a controlled substance admitted even though the "conversations reflect[ed] an unsuccessful attempt to further the aims of the conspiracy").

First Circuit decisions illustrate the breadth of Rule 801(d)(2)(E).  "'Statements between the conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy

further the ends of the conspiracy and are admissible so long as
the other requirements of Rule 801(d)(2)(E) are met.'" United
States v. Newton, 326 F.3d 253, 260 (1st Cir. 2003) (quoting United
States v. Ammar, 714 F.2d at 252); see also Fahey, 769 F.2d at 839
(statement admitted because the government contended that the
statement "was a lie fabricated to convince the agent that the
project should be allowed to continue" and therefore in furtherance
of the conspiracy).  In addition, statements merely identifying a
co-conspirator have been held to be "in furtherance" of the
conspiracies.  United States v. Flores-Rivera, 56 F.3d 319, 330
(1st Cir. 1995); United States v. Martinez-Medina, 279 F.3d at 117.
In United States v. Crocker, the First Circuit upheld admissibility
of statements between co-conspirators discussing the continuation
of a check-cashing scheme.  788 F.2d at 804-05.  The defendant
argued that the conversations were only idle talk that did not
further the conspiracy because they did not result in any criminal
activity.  The First Circuit disagreed:

> These recorded statements were more than idle chatter.
> These conversations identified the participants in the
> conspiracy and revealed their disposition and
> availability to continue with the [illegal] activity.

Crocker, 788 F.2d at 805.

Here, Asselin, Sr. conveyed to his son the defendant's plan to
depict the house payments as a repayment of profit from P.J.'s
earlier real estate ventures.  Asselin informed his father that
there was no such profit, and Asselin, Sr. replied, in essence,

that the defendant would think of another explanation.

These statements promoted the uncharged conspiracy to obstruct the investigation, since they were designed to develop a coherent excuse for the kickback payments. Indeed, when Asselin rejected the defendant's proposed explanation as unsubstantiated, Asselin, Sr. indicated that the defendant would conceive of another excuse. Thus, the statements furthered the conspiracy by permitting Asselin, Sr. and the defendant to refine their cover story, as well as by providing reassurance to Asselin.

3.  The Conspiracy To Obstruct Need Not Be Charged

Co-conspirator statements are admissible even in the absence of any conspiracy charge in the indictment. "The law is well settled that out-of-court statements may be admissible under Rule 801(d)(2)(E) even if the defendant is not formally charged with any conspiracy in the indictment." United States v. Ellis, 156 F.3d 493, 497 (3d Cir. 1998); see also United States v. McDowell, 918 F.2d 1004, 1009 (1st Cir. 1990).

It follows that if a conspiracy is charged in the indictment, co-conspirator statements from an uncharged conspiracy – a conspiracy different from that charged in the indictment – are similarly admissible. See, e.g., United States v. Piper, 298 F.3d 47, 54-55 (1st Cir. 2002) ("[T]he rigors of Rule 801(d)(2)(E) may be satisfied by showing that both the declarant and the defendant belonged to some conspiracy other than the substantive conspiracy

charged in the indictment.") (citing <u>United States v. Lara</u>, 181 F.3d 183, 196 (1st Cir. 1999)).

In <u>Ellis</u>, the defendant sought exclusion of the co-conspirator statements because they were made during a different conspiracy than that charged in the indictment. 156 F.3d at 497. The court determined that Rule 801(d)(2)(E) removed the "same conspiracy" requirement for admissibility. <u>Id</u>. at 497 n.4. <u>See also</u> <u>United States v. Arce</u>, 997 F.2d 1123, 1128 (5th Cir. 1993) ("the conspiracy that forms the basis for admitting co-conspirators' statements need not be the same conspiracy for which the defendant is indicted").

In <u>Ellis</u>, the First Circuit cited the Second and Seventh Circuits as requiring that a co-conspirator statement from the uncharged conspiracy be factually intertwined with the charged conspiracy, although the <u>Ellis</u> court reviewed this requirement as a restatement of the relevancy principles. 156 F.3d at 497. In any event, the co-conspirator statements at issue here are in fact directly related and intertwined with a charged conspiracy, since the uncharged conspiracy to obstruct was aimed at undermining the government's efforts to investigate and prosecute the charged conspiracy. Thus, the statements should be admitted.

III. <u>The Government's Summary Charts Should Be Admitted</u>

The government anticipates seeking, pursuant to Fed. R. Evid. 1006, the admission of several charts summarizing

voluminous records in the case.

In particular, the government intends to offer into evidence summarizing voluminous SHA board minutes that detail SHA projects that were bid for by the defendant and various other corrupt contractors who the government expects to testify at trial. The charts detail the following information for each contractor: the project name; the amount of the contractor's bid; the amount of the contract awarded; and the winner of the bid; and the date of the meeting in which minutes the contract was awarded.

In addition, the government intends to offer into evidence charts summarizing in chronological order payments received by the defendant from SHA and payments made by the defendant for various home construction expenses for Asselin family members.

Finally, the government intends to offer into evidence charts summarizing checks written and then cashed by a corrupt contractor, who later provided that cash to Raymond Asselin.

All of these charts are summaries of voluminous records which have already been made available to defense counsel, and most of which have already been provided to defense counsel as individual exhibits. These summaries will eliminate the need for witnesses to review with the jury the voluminous records and thus "avoid needless consumption of time." Fed. R. Evid. 611(a).[5] Federal Rule

_____

[5]    The government suggests that, if the defendants do not agree to the admission of these summaries, the Court hold a

of Evidence 1006 provides, in pertinent part:

> The contents of voluminous writings . . . which cannot
> conveniently be examined in court may be presented in the
> form of a chart, summary, or calculation. The originals
> or duplicates shall be made available for examination or
> copying, or both, by [the other party].

As long as summary charts meet the following requirements, they are

admissible:

> (1)   the underlying documents must be admissible, even
>       if they are never admitted;
>
> (2)   the underlying documents must be too voluminous for
>       convenient in-court review;
>
> (3)   the charts must accurately summarize the underlying
>       documents;
>
> (4)   the summary charts and the underlying documents
>       must have been made available at a reasonable time
>       and place for inspection by the opposing side; and
>
> (5)   the person who prepared the charts must have been
>       made available for cross examination.

United States v. Bertoli, 854 F. Supp. 975, 1051 (D.N.J. 1994).

The completeness of summaries is a matter that goes to the

weight of the evidence, rather than its admissibility:

> [s]o long as the government, exercising due diligence,
> collects whatever records are reasonably available and
> succeeds in introducing them, it may be permitted
> (subject, of course, to relevancy and perscrutation under
> Fed.R.Evid. 403) to summarize the data it has managed to
> obtain.  If defendants possessed exculpatory records not
> in the government's files, they could have offered them
> at trial or prepared their own summary.  By the same
> token, if there were gaps in the charts, the defense...

---

hearing before the start of trial, during which the government
may be able to address the defendant's objections.

had every opportunity to exploit them. In the last
analysis, completeness of the underlying records was for
the jury.

United States v. Sawyer, 85 F.3d 713, 740 (1st Cir. 1996).  As the

language of Rule 1006 indicates, although the underlying documents

may be admitted, there is no requirement that they be admitted

prior to the admission of the summary.  Air Safety, Inc. v. Roman

Catholic Archbishop of Boston, 94 F.3d 1, 7 & n.14 (1st Cir. 1996).

IV.  Conclusion

For the preceding reasons, the government respectfully submits

that the Court grant the instant Motion in Limine to Admit Certain

Evidence.

Filed this 25th day of August, 2006.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


                    /s/  William  M.  Welch
        WILLIAM M. WELCH, II
        Assistant United States Attorney



                    /s/  Steven  H.  Breslow
        STEVEN H. BRESLOW
        Assistant United States Attorney


CERTIFICATE OF SERVICE

Hampden,  ss.                    Springfield, Massachusetts
                                 August 25, 2006


I, Steven H. Breslow, Assistant U.S. Attorney, do hereby
certify that I have served a copy of the foregoing via ECF upon the
following:

James C. Rehnquist, Esq.
Goodwin Proctor LLP
Exchange Place
Boston, MA 02109
Counsel for Defendant Peter Davis


                              ___/s/ Steven H. Breslow___
                              STEVEN H. BRESLOW
                              Assistant United States Attorney